[Cite as *State v. Johnson*, 2014-Ohio-2638.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 99715

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## EDWARDLEE JOHNSON

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-564315-B

**BEFORE:** Keough, J., Celebrezze, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** June 19, 2014

**ATTORNEYS FOR APPELLANT**

Erin R. Flanagan
1370 Ontario Street
2000 Standard Building
Cleveland, Ohio 44113

Russell S. Bensing
1370 Ontario Street
1350 Standard Building
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Jennifer L. O'Malley
        Brent C. Kirvel
Assistant Prosecuting Attorneys
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} In 2012, defendant-appellant, Edwardlee Johnson, was indicted for the murder of Carlos Coates. He was charged with one count each of aggravated murder, murder, and two counts of felonious assault, with each count also containing a notice of prior conviction, repeat violent offender specifications and one- and three-year firearm specifications. He was also charged with having a weapon while under disability. Johnson waived his right to a jury trial on the weapon while under disability count and the notice of prior conviction and repeat violent offender specifications. The remaining counts and specifications were tried before the jury, where the following evidence was heard.

{¶2} Cleveland police officer Carma Crosby testified that she was working with officer Greg King in the early morning hours of June 12, 2012, when they responded to a call for females fighting in the area of East 169th, Grovewood, and Ozark Streets. When they arrived, they were flagged down by a female, later identified as Dionne Green ("Green"), who told them her cousin had been shot. The officers then called for EMS. According to Crosby, Green stated during her on-scene interview that either "Ed or Capone" shot her cousin.

{¶3} Also responding to the call for females fighting was Cleveland police officer Edward Csoltko. He testified he saw a male, who was identified as Carlos Coates, lying in the doorway of the house. As he looked for shell casings around the house, Csoltko

found a car key underneath the bushes in the front of the house that belonged to the Jeep parked in front of the house.

{¶4} Homicide Detective Melvin Smith responded to a call for a male shot on East 169th Street in Cleveland. He testified that he spoke with the responding officers, investigated the scene, and conducted on-scene interviews with Green and Joe Fussell ("Fussell"). As a result of those interviews, he learned the names of potential witnesses and suspects including, Tamera Coleman, "Capone," "Ed," and "Leon," whose street name was "Light Skin."

{¶5} After completing the investigation of the crime scene, he and partner, Detective Sandoval wanted to interview Peter Council, the owner of the Jeep Liberty that was parked at the crime scene. While in route to speak with Council, Detective Sandoval received a call from "Capone," whose real name is Miekal Gale. They learned that Gale was at University Hospitals and wanted to speak with them.

{¶6} According to Detective Smith, Council was surprised to see homicide detectives at his door and that his vehicle was involved in any situation. However, Smith testified that it appeared that Council already knew that his vehicle was not with Gale, who was the person he lent it to last. As a result of the interview with Council, Smith learned Council received instructions by Gale to report the car stolen. Smith further learned that both Gale and Tamera Coleman lived in the same apartment complex as Council.

{¶7} After interviewing Council, they went to Gale and Coleman's apartment and located Coleman. Smith described Coleman's appearance as being a "rough state of being, hair all over her head, somewhat intox[icated], and lethargic." Coleman indicated to Smith that she expected to see them and agreed to go down to the Justice Center for questioning.

{¶8} Smith testified that Coleman was dishonest with them during questioning, specifically that she did not know of anyone named "Ed." After Coleman was advised of her constitutional rights, she agreed to continue talking with them, but the interview was terminated because Coleman continued being dishonest with them; Coleman was arrested.

{¶9} About an hour later, Smith learned that Coleman wanted to speak to him again. During this interview, Coleman stated she wanted to be honest and admitted that she knew "Ed," and that she considered him as her brother because of his relationship with her deceased brother. She further admitted that Gale was her live-in boyfriend, a fact which she previously denied.

{¶10} A few days after the interview with Green, Smith learned that "Light Skin's" real name was Leon Howard. He also learned that Fussell was not honest with him at the crime scene about his whereabouts that morning. Smith further testified that Fussell, Howard, and Gale all avoided giving the detectives a formal statement, and when Gale finally met with detectives, he was uncooperative, and his attorney was present.

{¶11} According to Smith, Howard was difficult to locate. It was not until Smith learned that Howard's father was a retired police officer and made contact with him were

they able to interview Howard. This occurred in the winter of 2012 — six months after the murder.

**{¶12}** Green testified that Coates was her second cousin but "like a brother." During her testimony, Green identified the witnesses to Coates's death. Coleman is the mother of Green's niece and had been dating and living with Gale. Green stated she knew Coleman for "years" and only knew Gale for one week prior to Coates's murder. Green also identified Fussell and Howard as friends, whom she knew for years. Green denied knowing Johnson.

**{¶13}** Green described the events leading up to Coates's death. She testified that earlier in the evening on June 11, 2012, she was at her house with Coleman, Howard, and Coates. They planned on going out while Coates stayed home to watch her and Coleman's children.

**{¶14}** As the evening progressed, Coleman and Green started "bickering" about "the past" and about Coleman "turning tricks" out of Green's house. Coates started getting involved in the conversation, which caused Coates and Green to exchange words. Although Green believed that they were "just playing around," a pushing and slapping match began between the two, with Coates initiating the first contact and then Green hitting him with a shoe.

**{¶15}** During this commotion, Coleman told Coates to stop hitting Green or she would "kick his ass." Coates pushed Coleman against the wall and she was in his face and hitting him. Coates hit Coleman back, which prompted her to start yelling that he

"wanted to fight like a bitch," so she was going to call her "brother." Coleman was heard on the phone screaming about Green and Coates.

{¶16} After the phone call, Green, Coleman, and Howard went to a bar, where Green and Coleman talked about the fight with Coates. During this conversation, Coleman received a telephone call and went into the bathroom to take the call. When Coleman did not come out of the bathroom, Green went into the bathroom and Coleman was still on the phone talking to someone who Green testified she did not know. According to Green, Coleman was "angry and hostile." After Green told her not to call anyone to her house, Coleman became "real hostile, eager, and mean." When questioned later by the police, Green told them that Coleman was talking on the phone with "Ed" and that she learned from Coleman that he was coming to Cleveland from Akron. "Ed" was identified as Johnson.

{¶17} They left the bar and Howard drove them to a gas station to find some drugs. Green testified that she left Howard's car and went across the street. When she came back, she saw Gale, Coleman, Howard, and Fussell standing near Gale's vehicle. Coleman sat inside Gale's vehicle, and Green sat in the front seat of Howard's car where she and Howard smoked with Fussell.

{¶18} When they arrived back at Green's house, Coates was standing on the front lawn of her house upset because no one brought him cigarettes. Green then walked up to the corner of Grovewood and East 169th Streets where Fussell had parked his truck. Green stated that after Coleman and Gale arrived, Coleman was upset with her because

Fussell was there. Green testified that Coleman kept "walking up on her," so, "I hit her," which caused them to start fighting in the street. While they were fighting, Green saw a man walking toward her house, on the other side of the street. She stated she did not recognize the man, but described him as being "light-skinned, tall, dark clothing" and it "looked like he had something on his hip." Green initially though the man was coming to help, but about five seconds after the man walked by, she heard a gunshot. Green was able to break free from Coleman, and ran to her house with Coleman following.

{¶19} Green stated that when she got to her house, she saw Gale pacing back and forth in front of her house looking for his car key, and saw Coates lying in the doorway. Green testified that she knew Coates was injured, but just thought he was "knocked-out,"and she did not at that time associate the gunshot with Coates's injury. In fact, she tried lifting Coates to wake him. When she did this, Coleman approached her, said some words to her, and then hit her.

{¶20} After this altercation, Coleman, her children, and Gale left, and Green ran to call for help. On the porch of her friend's house, Green saw Howard for the first time since the gunshot was heard. Green testified that she used his phone, over his protest, to call 911. However, a police cruiser was driving up the street, so she flagged down the cruiser.

{¶21} Green testified that the unidentified man she saw walking was not Howard because of the male's walk. She further admitted that when she gave her initial interview to the police at the scene, she did not tell them about the unidentified man

walking down the street before she heard the gunshot. According to Green, she never saw the unidentified man again.

{¶22} Fussell testified that he grew up with Coates, Coleman, and Green; he did not know Gale or Johnson, and met Howard for the first time in the early morning of June 12, 2012, after receiving a phone call from Green, who wanted money so she could buy PCP. He testified that he rode his bicycle to the gas station and when he got there, both Coleman and Green got out of Howard's car. Green then went to a friend's house on another street. While he waited for Green, Coleman had some words with him, and then she got into a Jeep that pulled up at the gas station. After Green returned, he, Green, and Howard smoked a PCP cigarette, and Green invited him back to her house.

{¶23} Fussell testified that he went home and then drove his truck to Green's house. When he drove by her house, he saw Coates standing in the driveway. According to Fussell, Coates had a serious look on his face like something was wrong. Fussell spoke briefly with Coates, who told him to "watch out for that car right there," pointing at a car parked up the street. After Fussell parked his truck on the corner of East 169th and Grovewood Streets, Green walked up to the corner. Fussell testified that Coleman arrived, jumped out of the Jeep, and immediately started fighting with Green.

{¶24} Fussell testified that when he heard Coleman and Green fighting, he was going to get out of his truck, but he saw somebody walk by the passenger side of his truck — "like cocking a gun or something." He described the person as a male who was a little taller and heavier than him; and his skin complexion was a little lighter than his

own.  Fussell stated that he was aware of the gun because "I had guns before.  I don't know, you just — I just seen the gun.  I seen him cock it or playing with it, whatever he was doing.  He tucked it.  He walked down the side of the house.  Then a few minutes later, I had heard a gunshot."

{¶25} Fussell stated that after he heard the gunshot, he ducked down in his truck. When he looked up, he saw Coleman leaving the house with her children.  According to Fussell, Green was upset stating that she could not "believe this girl brought this shit to her house.  I can't believe she did this." After Green told him that Coates "was knocked out or something," Fussell tried to wake him up.  As he was "tapping" at Coates, Fussell noticed a red mark on Coates's eye, like somebody had punched him.

{¶26} On cross-examination, Fussell admitted he did not give an official statement to the police until he was arrested in January 2013, even though he knew homicide detectives wanted to speak with him about Coates's murder.  He stated that he did not want to get involved because he had no business being there that evening.

{¶27} Leon Howard ("Howard") testified he knew Coates for about a year and Green for two or three years.  He "knew of" Fussell, but testified that he did not know Coleman, Johnson, or Gale.

{¶28} On the evening of June 11, 2012, Howard went to Green's house to pick up some belongings.  When he arrived, Coleman and Coates were already there.  Howard, although uncertain at times as his testimony progressed, stated that everyone was drinking but not getting along.  He stated that Coleman, Green, and Coates were "all at each

other" — with Coleman and Green arguing and then Coleman and Coates physically fighting. Howard stated that when Coleman started hitting Coates, he had to break them up, and then suggested they go to the bar.

{¶29} Howard stated that he could see Coleman and Green were still arguing at the bar. According to Howard, the girls kept running in and out of the bathroom and Coleman was making calls to "Capone and to the defendant." When asked how he knew Coleman was calling Johnson, he responded, "cuz she was mad" and because "[Coates] had hit her." Howard further testified that Coleman was texting someone who was "coming up from Akron."

{¶30} Howard testified that they left the bar around 2:00 a.m. and went to a gas station where Coleman was meeting Gale, but later testified that they went to the gas station at the request of Green. Upon arriving at the gas station, Green left while Howard and Coleman waited in the car. About 30 minutes later, Gale drove up in a Jeep and Coleman got out of Howard's car, standing between the two vehicles. Howard testified that he kept asking Coleman why Gale was "mugging" him, meaning staring at him. Howard testified that he and Gale never spoke, but just stared at each other.

{¶31} Howard testified that while waiting for Green to return, he noticed that Coleman had left her cell phone in his backseat and that he fielded over 20 calls from Coates during the entire evening requesting that they bring him cigarettes. Once Green returned to the car, they drove back to Green's house.

**{¶32}** When they arrived, Coates was standing in the driveway "upset" because "they was coming to fight him." According to Howard, Coates knew that Gale and someone from Akron were coming to fight him because "Coleman told Coates that before leaving for the bar."

**{¶33}** Howard testified that Coates told him that he was watching a black Honda that was parked across the street up by Grovewood because "no one had gotten out the car yet." At this time, a Jeep pulled up, almost stopping in front of Green's house. After Howard told Coates that Coleman was in the Jeep, Coates ran toward the Jeep, but the driver pulled away causing Coates to chase after it. Howard testified that Coates stopped and walked back to the driveway. As Coates walked back, Howard told him it "ain't seem right," meaning "if they want to fight, they should fight." Howard testified the Jeep then came back down East 169th and stopped, parking right in front of Green's driveway.

**{¶34}** Gale stepped out of the Jeep, and according to Howard, was walking toward where the girls were fighting. Howard testified he noticed a male wearing a hoodie walking down the other side of the street toward Ozark Street. The male walked past Green's house, however when Howard noticed Gale walking toward them, he also noticed the male had turned around and was now walking over to them. Howard testified that Coates, who was still on the porch, started arguing with Gale, who was standing on the grass in front of the house. According to Howard, the male wearing the

hoodie walked up, pulled the hood off his head, and asked Coates "you remember me?" Howard stated he could see the male's face and identified the male as Johnson.

{¶35} According to Howard, Coates and Gale stopped arguing, and Coates answered Johnson's question. Howard testified that his cell phone started ringing, and when he reached for his phone, Johnson pulled a gun, pointing it at Howard, who was standing next to Coates on the porch. When Howard identified that it was only his cell phone, Johnson pulled the trigger of the gun, but the gun jammed. According to Howard, Johnson then ran to the bushes on the side of the house, but Gale approached Coates and punched him the face, which started a wrestling match between them. Howard stated that Coates and Gale were fighting for about two minutes when he heard Gale scream and saw him fall on the grass. While not mentioning anything about a weapon during direct examination, Howard testified on cross-examination that Coates had a nine-inch knife and stabbed Gale.

{¶36} After Gale fell, Johnson re-emerged from the bushes, raising the gun. Howard yelled for Coates to run in the house, and as Howard ran into the house, he heard a gunshot and saw Coates's body drop to the floor. Howard admitted that he did not see who actually pulled the trigger and shot Coates, but denied that he shot him.

{¶37} After seeing Coates fall, Howard hid by the couch and called out to Coates. When Coates did not respond, Howard ran to the kitchen and hid by the stove, and then ran down into the basement and hid in a corner for 15 or 20 minutes. During that time, he could hear the kids running around upstairs and fighting between Green and Coleman.

When he did not hear any more noise coming from upstairs, Howard went out the back door and ran through some yards toward Ozark Street. Howard testified that when he was hiding in some bushes, he saw Gale, Coleman, and her children walking down the street toward East 170th Street. Howard stated that he then got into his car and drove towards East 168th Street. Although he became more uncertain later in his testimony, Howard testified that he saw them get into a dark-colored car.

{¶38} Howard testified that he drove to a friend's house on East 168th Street and sat on the porch of the house, until Green ran to the house crying and stating she was scared because Coates "was dead." Rather than going with Green back to her house, Howard stayed on his friend's porch and called his attorney. After advising his attorney what had happened, he asked his attorney to call the homicide unit to see if they knew whether Howard was there at the scene. According to Howard, his attorney called him back and stated that they did not have his name in connection with Coates's death. Detective Smith verified that an attorney did call about Coates's death.

{¶39} Howard admitted that he did not voluntarily speak to the police about Coates's murder until December 2012, because he did not want to be involved. Howard admitted that although his father is a police officer, it was not until he was being threatened with an arrest warrant did he agree to talk to the police. Furthermore, he stated that he did not talk to his father about the murder, but admitted that when he told his aunt and uncle, who are also police officers, they advised him to "get rid of [Coleman's] cell phone" that was left in his car.

**{¶40}** Miekal Gale ("Gale") testified that on June 12, 2012, he had a case pending for felonious assault and domestic violence, for which he was ultimately placed on probation. Following the events of June 12, 2012, he was charged with obstruction of official business, assault, and trespassing. Gale admitted that he hoped in exchange for his testimony against Johnson, he would remain on probation, even if he pleaded guilty to the new charges.

**{¶41}** Gale testified that in the early afternoon of June 12, 2012, he drove Coleman to Green's house. He then went home but later went to a strip club with a friend until 2:00 or 2:30 a.m. Afterwards, he called Coleman who asked him to pick her up at a gas station. Gale testified that Coleman's demeanor was "calm, but drunk." After she got into his vehicle, Coleman told him that she and Coates had "gotten into it" and that Coates "put his hands on her." Gale testified that she explained the whole situation to him and that her "brother" was coming.

**{¶42}** Gale identified Coleman's "brother" as Johnson, whom he had met a couple of times. Gale stated that he was skeptical that Johnson was really her "brother" in a familial sense. He described his relationship with Johnson as not a personal one; he only spoke to Johnson when he would call looking for Coleman. Gale also denied having a falling out with Johnson after suspecting that Johnson and Coleman's relationship was something more.

**{¶43}** Gale testified that when he asked Coleman why she called Johnson, she responded:

A: She saying he need to come [f * * k] him up.   He need to learn a lesson.

Q: And who is she referring to?

A: Carlos.

**{¶44}**   Gale testified that while they were driving over to Green's house, Coleman used his cell phone to call Johnson because she left her phone in Howard's car.   Based on those conversations, Gale testified that he had reason to believe that Johnson was on his way from Akron, but it was not his intention to meet up with Johnson to approach Coates or for Johnson to be his "back up."   However, on cross-examination, he testified that he was surprised to see Johnson at Green's house.

**{¶45}** When they arrived at East 169th Street, Gale approached Coates, who was sitting on the porch, and asked him what happened between him and Coleman.   Gale stated that he got upset when Coates told him to mind his own business.   Gale then walked up from the lawn and slapped Coates in the face, which caused Coates to start "swinging back."   Gale testified that when he heard a gun cock, he turned and saw Johnson, who was wearing a red hoodie, standing beside him on his right, but facing Coates.

**{¶46}** Gale started backing up towards his car when he saw Johnson cock the gun, raise it, and pull the trigger, but the gun jammed.   According to Gale, Howard ran inside the house, but Coates "started mouthing off, saying that this is some bitch ass shit, you a bitch ass [n***a]."   He then saw Johnson go behind some bushes, and he could hear

Johnson trying to unjam the gun. Gale testified that he then heard a gunshot when he was by the driver's side of his vehicle. At that point, Gale realized he had been stabbed.

{¶47} Gale denied bringing a firearm to the scene or shooting Coates. He stated that when he heard the gunshot, he ducked, and after rising up, he did not see anyone. Gale testified that he just wanted to leave but realized he did not have his car key. When he went by the porch to look for his key, he saw Coates laying in the doorway and thought "that man might be dead." But instead of checking on him, he continued looking for his car key.

{¶48} Gale testified that Coleman and Green came running up from the corner; both entering the house by stepping over Coates's body. According to Gale, Coleman and Green got into a verbal altercation that turned into a scuffle by the doorway where Coates was lying. Gale testified that Johnson drove up in a dark colored car in front of Green's house. Both he and Johnson yelled for Coleman "to come on." Gale testified that because Coleman was taking so long, Johnson drove off, heading toward Ozark Street.

{¶49} Gale testified he started walking, with Coleman and the kids following him, heading toward where Johnson was parked. After getting into Johnson's car, he and Johnson had a conversation about what happened.

A: I told him that I think you shot him.

Q: All right. Does Ed respond to you?

A: Yes.

Q: What's his reaction to that?

A: He said that — he asked me did I shoot — did he shoot him. I said it's a possibility that you shot that man and that man is dead.

Q: All right. What was Ed's reaction to that?

A: He said, I only shot one time.

Q: I'm sorry?

A: I said he only shot — fired a shot one time.

Q: What's your reaction? Did you respond to that?

A: I'm like, I think that one shot killed him.

Q: All right. Does Ed have a reaction to that?

A: Yes.

Q: What's he say?

A: That he ain't mean to do it if that's what happened.

Q: Does Ed seem to be —

A: Remorseful?

Q: Anything like that, remorseful, sorrowful, excited, mad, glad or sad?

A: He didn't seem like he was happy.

Q: All right.

A: He seemed like he was in a — like what did I do, what did she — kinda' like what did I get myself into. I didn't mean for it to happen that way.

**{¶50}** According to Gale, Coleman, who was seated in the back seat with her children, was "hyper, pumped up." Gale told Coleman to call and report that someone got shot on East 169th Street. According to Gale, Coleman called the police, but she told the police that she had been raped and that someone could be dead or shot in the East 169th area. However, Detective Smith testified that no calls were received reporting a shooting.

**{¶51}** Gale testified that Johnson drove about five streets away and then stopped to retrieve the gun, which was hidden in the grass. Johnson placed the gun under the hood of the car and drove to Gale and Coleman's residence.

**{¶52}** Once they returned home, Gale, although wheezing and out of breath, walked to a gas station to buy a cigar, peroxide, and alcohol to treat his stab wounds. He also threw his bloody clothes into a dumpster at a nearby plaza, which were never recovered. His brother eventually took him to University Hospitals for medical treatment where he gave the nurse false information about his identity and his injuries.

**{¶53}** Gale testified that while at the hospital, he called Detective Sandoval to tell him what had happened so he would not "be affiliated with something he had nothing to do with." Gale admitted that he was motivated to call the police after he learned that Coleman was being detained by police.

**{¶54}** Gale admitted that when he first met with detectives, he lied that he did not get into the vehicle with Johnson in order to protect himself. Gale also admitted he was not truthful with his uncle, who owned the Jeep. He initially testified that he did not

speak to his uncle until after he was released from the hospital, but then remembered that he spoke to him while walking home from the gas station after getting his medical supplies. Gale testified that he told his uncle to report the Jeep stolen because he could not find the key and it would further distance himself from the crime.

{¶55} On cross-examination, Gale initially denied that he spoke with Johnson over the phone that evening. However, after being shown his cell phone records, he admitted that he spoke to Johnson. According to his phone records, Gale called Johnson on the evening of June 11, 2012, at 11:35 p.m. and then in the early morning hours of June 12, 2012, at 12:14 a.m., 12:16 a.m., 12:27 a.m. and 12:48 a.m. Additionally, according to the phone records, Gale called Coleman's phone multiple times when she was sitting with him in his car at the gas station even though her cell phone was in Howard's vehicle.

{¶56} Dawnteasha Crumedy testified that she knew Coates for 15 to 20 years and he is the father of one of her children. She also stated that she had known Coleman for over 20 years and described her as her best friend. Crumedy testified that she knew Johnson through Coleman, and knew of him as Coleman's brother, which she accepted as true. She testified that when she spoke to Coleman after Coates's death, their conversation was not pleasant — they were hollering and screaming at each other. Crumedy also testified that she spoke with Johnson after her conversation with Coleman, and that he wanted to know where both Coleman and Gale were. Johnson also wanted to speak with her, which she agreed to arrange; however, she called the police instead.

{¶57} Denise Novak, Johnson's fianceé, testified that on the evening of June 11, 2012, Johnson left their house to go out with his friends. She stated she could not reach Johnson through calls or text messages that entire evening and into the early morning of June 12, 2012, which upset her because he was out late and he was using her car, a black Chevy Impala.

{¶58} When he came home, Johnson explained to her that in the early morning on June 12, 2012, he picked up Coleman and her children. He kept saying that Coleman was "crazy," "he was tired of her stuff," and that he "didn't want any part of it." On cross-examination, she stated that Johnson did not pick them up because of Coleman calling; rather, it was when Gale called him and asked him for a ride because he could not find his car key. She further admitted that they "have given [Gale] and [Coleman] rides before because they always need your help to get out of stuff."

{¶59} As her testimony progressed, she stated that Johnson told her that Gale had gotten stabbed, was having trouble breathing, and bleeding in her car. But that Johnson never said anything to her about someone being dead. She stated that no examination was done of her vehicle, which Detective Smith confirmed.

{¶60} Novak testified that a week later, Johnson's father called stating that Johnson was on the television regarding the murder of Coates. This was the first time, according to Novak, that Johnson learned that someone had died. Johnson turned himself in a few days later.

{¶61} Tamera Coleman ("Coleman") testified on behalf of the State and admitted she had been charged with the same offenses as Johnson, but entered into a deal where she would be pleading guilty to manslaughter in exchange for testifying against Johnson.

{¶62} Coleman testified that Johnson is like a brother to her, who she has known for 10 years and whom she met through her late older brother. She further testified that she knew Green, Coates, and Fussell for about 15 years. She stated she met Howard on the night of the murder and that Gale was her boyfriend of three years.

{¶63} Coleman told the jury her version of events about the evening of June 11, 2012, and early morning of June 12. She testified that Gale had someone drive her over to Green's house earlier in the day. Green became upset with Coates and when the argument turned physical, Coleman broke up the fight. However, Coates started fighting with her and then she and Green began fighting. Coleman testified that Coates put his hands on her by punching her with his fists and she defended herself. She said she felt disrespected and mad because she was only trying to break up a fight between him and Green.

{¶64} According to Coleman, Green wanted Coates to leave her house because of all the fighting but he refused. Coleman wanted to leave Green's house, but Howard refused to take her and her children home; therefore, she called Johnson. Coleman told the jury that she told Johnson that she got into an altercation with Coates and that she needed someone to come pick her and her children up at Green's house.

{¶65} Coleman testified that they left for the bar around 2:00 a.m. and she went to the bar to wait for Johnson. She stated that while at the bar, she called Johnson to make sure he was coming to pick her up, and she and Green were discussing what happened with Coates.

{¶66} During this time, Gale had called her and was upset that she went out. She told Gale that she got into an altercation with Coates, but that Johnson was coming to pick her and the kids up. Gale responded that he wanted her to stay where she was and that he would come for her. She told Gale they were going to a gas station so Green could meet up with Fussell. According to Coleman, because Gale told her that he would call Johnson and tell him that he was picking her up now, she did not call Johnson. Coleman stated that Gale and Johnson were not friends, but social. She denied that Gale ever questioned her relationship with Johnson, until this incident happened.

{¶67} Once at the gas station, Coleman sat in Howard's car until Gale drove up in a Jeep. According to Coleman, everyone followed each other back to Green's house. Coleman denied that she ever called Johnson from Gale's cell phone. She testified that the last time she talked to Johnson was when she was at the bar. She testified she assumed Gale called Johnson and told him not to come up; she had no idea that Johnson was still coming to Cleveland. However, when they arrived on East 169th Street, Coleman saw Johnson's car parked on the street. Even though Johnson was parked by Fussell's truck, and Coleman spoke briefly to Fussell, she did not talk to Johnson.

{¶68} Coleman testified that she went inside to get her children while Gale stayed in the Jeep. According to Coleman, Green approached her and asked her why she was leaving. Coleman stated that she pushed Green stating that she was too drunk to remember what happened, and they started pushing and tugging each other.

{¶69} Coleman stated she was able to walk away and walk to Green's house. She believed Johnson was still in his car, and she saw Coates and Gale were on the porch. Once inside the house, she and Green got into another physical altercation. She testified that after breaking loose and getting her children, she came downstairs and saw Coates lying in the doorway. She denied hearing a gunshot.

{¶70} At that point, Johnson and Gale were in the truck, so she got in with her kids and they left. When asked about the black Chevy Impala owned by Johnson's fianceé, Coleman stated that Johnson picked them up in his green Chevy Suburban. Coleman testified that she asked Gale and Johnson what happened, and Gale told her, "Carlos stabbed him, and Edward shot him"; Johnson was not really saying anything. She testified she called the police and told them there was an altercation, which Detective Smith stated the police never received.

{¶71} Coleman denied that her testimony in court was different than what she told the detectives; however, she subsequently admitted she told the detectives and the prosecutor that Johnson admitted that he shot Coates. Coleman could not explain why she did not tell the jury that Johnson made this admission, but after being pressed, she testified that Johnson stated in the car that he shot Coates.

{¶72} Coleman admitted that she does not know what happened on the porch, but denied that she ever called Johnson for him to murder Coates and stated that she never saw Johnson get out of his car.

{¶73} Coleman admitted she still loved Gale, intended to stay with Gale, and that she still talked to Gale. When asked whether Gale killed Coates, she responded "I don't know about that because I was not out there. I only know what I was told. I don't know that. I don't know what happened outside." When asked what she was told she responded:

A: That Edward shot Capone and Capone — and Carlos stabbed Capone.

Q: Right. And who — tell us again who the words — whose mouth did it come out of?

A: Edward said that and Capone did.

Q: Said what? What did Edward say to you?

A: Edward said that he — Ca — Carlos stabbed Capone, and he shot him.

{¶74} Dr. Krista Pekarski, who conducted Coates's autopsy, testified that the proximity of the gun to the entrance wound was at an indeterminate or distance range — beyond a couple of feet. Dr. Pekarski testified that the bullet was recovered from the victim's cerebellum and that the trajectory of the bullet, based on the entrance wound and where the bullet was recovered, was from left to right, from the front of the head to the back of the head, and slightly upward. On cross-examination, Pekarski clarified that the she stated "slightly upward" because the bullet was recovered from the brain after it was removed; therefore, there was no way to do an exact measurement. But anatomically

speaking, she was able to determine the angle as "slight." She further testified that the trajectory angle of the bullet was not beyond 20 degrees — "slight incline" and "not a lot of deviation in the up and down plane."

{¶75} The trial court denied Johnson's Crim.R. 29 motion for judgment of acquittal and the matter was submitted to the jury.

{¶76} While the jury was deliberating, Johnson moved for a mistrial based on the state's use of enlarged summaries of the cell phone records during its rebuttal closing argument. Johnson maintained the improper demonstrative evidence was used by the state for the purpose of showing that Johnson acted with prior calculation and design by "lying in wait" to shoot Coates. After conducting a hearing, the trial court concluded that the enlargements were not prejudicial because the jury also heard testimony that Johnson drove to Cleveland for the sole purpose of picking up Coleman and her children.

{¶77} The jury returned a verdict of not guilty on the charge of aggravated murder, but guilty of murder and both counts of felonious assault and the attendant firearm specifications. The trial court subsequently found Johnson guilty of having a weapon while under disability and the notice of prior conviction and repeat violent offender specifications. Johnson was sentenced to an aggregate sentence of 25 years to life in prison. He now appeals his convictions, raising six assignments of error.

I.  Manifest Weight of the Evidence

{¶78} In his first assignment of error, Johnson contends that "the trial court erred in entering a conviction which was against the manifest weight of the evidence, in

violation of defendant's right to due process of law, as protected by the 14th Amendment to the United States Constitution."

**{¶79}** "'A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion.'" *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

**{¶80}** Under well-settled precedent, we are constrained to adhere to the principle that the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *See State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections — observations that

are critical to determining a witness's credibility. *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 1996-Ohio-222, 661 N.E.2d 1068, and *State v. Antill*, 176 Ohio St. 61, 66, 197 N.E.2d 548 (1964). The trier of fact is free to accept or reject any or all of the testimony of any witness. *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16. As this court has previously recognized, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial. *State v. Gaughan*, 8th Dist. Cuyahoga No. 90523, 2009-Ohio-955, ¶ 32, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶81} Johnson argues that his convictions are against the manifest weight of the evidence because the state's theory of the case ignored the fact that Coleman also called Gale to the scene, and Gale had more of a motive to shoot Coates because Coleman was his live-in girlfriend, and he had a physical altercation with Coates during which time Gale was stabbed. Johnson also contends that the jury lost its way because all the witnesses were untruthful with the police, provided inconsistent accounts of the events, and the trajectory of the bullet paired with the testimony did not fit that Johnson was the shooter. However, the jury heard all the evidence, including the conflicting and self-serving testimony by the witnesses, and considered the circumstances surrounding Johnson's identification as the shooter. Additionally, the testimony about the trajectory of the bullet, coupled with Howard's testimony, demonstrates that Johnson's presence in the driveway does not exclude him as the shooter.

**{¶82}** Green, Fussell, and Howard were the only individuals who did not have any self-preservation motives at this trial. Green and Fussell both testified about seeing a man walking toward Green's house with a gun. Fussell testified that he heard the gun being "cocked." Both described the man as "light-skinned," and testified that moments after the man passed, they heard a gunshot. While neither saw the shooting, Officer Crosby testified that Green told her on scene that either "Ed" or "Capone" shot Coates.

**{¶83}** The jury also heard Gale's testimony of his involvement. While his testimony and actions taken after being stabbed, including throwing away his bloody clothes, were suspect, the jury heard this testimony and drew its own conclusions from it. Gale testified that he and Coates engaged in a physical altercation during which he was stabbed. But when Johnson approached the scene with a gun drawn, Gale started retreating toward his vehicle. He then heard a gunshot and saw Coates lying in the doorway. Although Gale's testimony was self-serving and he was untruthful with everyone, certain consistencies existed about the events of the shooting and the actions thereafter, which demonstrates that the jury did not lose its way in finding Johnson guilty.

**{¶84}** The jury heard testimony that Johnson drove up in front of Green's house and yelled for Coleman to "come on," while she was retrieving her children and fighting with Green in the house. When she did not respond, Johnson pulled off and parked away from the scene to wait for them, which is consistent with Howard's testimony that he saw Coleman and Gale walking down the street and enter a dark-colored vehicle that was parked and driven by someone else.

{¶85} The jury also heard both Gale and Coleman testify that once they got into the car, it was discussed that Johnson may have killed Coates. According to Gale, Johnson stated that he only fired one shot, he did not mean to do it, and then questioned whether Coates was dead. Coleman testified that she told the police that Johnson admitted to shooting Coates, however, at trial she was not entirely forthcoming with this information; rather, she stated that Gale told her that Johnson shot Coates.

{¶86} Even discounting all of Gale and Coleman's testimony, Howard's testimony establishes that Johnson shot Coates. Howard saw Johnson approach Coates with a gun. Although Howard testified that he did not see who pulled the trigger, he heard a gunshot almost immediately after seeing Johnson re-emerge from the bushes with the gun in the air. It was reasonable for the jury to infer that Johnson pulled the trigger. Additionally, if the gun was being lowered when it was fired, it could create the "slight incline" that Dr. Pekarski testified regarding the trajectory of the bullet.

{¶87} Finally, during Novak's testimony, she testified that Johnson used her black vehicle to pick up Coleman, her children, and Gale, who had been stabbed. Furthermore, two different times during her testimony, Novak stated that it was not until they received a phone call that they learned that Coates was dead. The jury could have inferred that the use of the word "dead" was significant, meaning that Johnson knew that Coates was shot. This would be consistent with Gale's testimony that Johnson was in disbelief that the one shot would have killed Coates.

**{¶88}** What the jury could not ignore, however, was the uncontroverted testimony that Johnson drove from Akron to Cleveland at Coleman's request. Coleman called Johnson and she could be heard yelling in an angry, hostile, and eager way, and stating that Coates "needed to learn a lesson." The cell phone records put Johnson in the area around the time of the shooting. In fact, Coleman testified she saw Johnson's car parked on East 169th Street when she and Gale arrived at Green's house. Howard testified that Coates was watching a black car that pulled up, but no one exited.

**{¶89}** The jury heard the inconsistencies, the self-serving testimony, the motivations, and that the witnesses were all evasive or untruthful to the police at some point during the investigation. Furthermore, the jury's verdict demonstrates that it considered all the evidence, weighed the testimony of all the witnesses, and discounted and accepted testimony where the jury determined it was appropriate. Accordingly, with the investigation and evidence presented to the jury, and based on the record before us, we cannot say that this is the exceptional case where the jury clearly lost its way in finding Johnson guilty of the murder. Johnson's first assignment of error is overruled.

II. Confrontation Clause — Hearsay

**{¶90}** During direct examination, Gale testified about his reaction after learning that Johnson was coming to Cleveland:

A: I asked her why she called him.

Q: All right. And what was her reaction to you inquiring about why?

A: She saying that he need to come [f * * *] him up. He need to learn a lesson.

Q: And who is she referring to?

A: Carlos.

(Tr. 587-588.)

Q: All right. Did you have conversation with — did Tamera make comments relative to this defendant coming to the Cleveland area or coming to where Carlos was?

A: Yes.

Q: What was the nature of any comment?

A: She stated where was he, how long was he gonna' be, and that she wanted him to [f * * *] him up. That was the exact words.

(Tr. 633.)

{¶91} In his second assignment of error, Johnson contends that the trial court erred in the admission of this evidence, in violation of defendant's right to confront witnesses, as protected by the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he contends that Gale's testimony regarding what Coleman told him about Johnson's purpose for driving to Cleveland was inadmissible hearsay.

{¶92} A trial court possesses broad discretion with respect to the admission of evidence, including the discretion to determine whether evidence constitutes hearsay and whether it is admissible hearsay. *State v. Graves*, 9th Dist. Lorain No. 08CA009397, 2009-Ohio-1133, ¶ 4. We review a trial court's decision regarding admissibility of evidence under an abuse of discretion standard. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984).

**{¶93}** However, where no objection is raised to the admission of alleged hearsay testimony, it may be considered by the trier of fact for whatever probative value it may have. *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 208, 389 N.E.2d 1113 (1979), citing *State v. Petro*, 148 Ohio St. 473, 76 N.E.2d 355 (1947), paragraph eight of the syllabus. Moreover, the failure to raise a timely objection at a time when the trial court can correct an error constitutes a waiver of any objection to the admissibility of evidence. Nevertheless, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Thus, we review the admission of the alleged hearsay statements under the plain error standard of Crim.R. 52(B).

**{¶94}** Plain error consists of an obvious error or defect in the trial proceeding that affects a substantial right. Crim.R. 52(B). Therefore, plain error occurs only when, but for the error, the outcome of the trial clearly would have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978); *State v. Hill*, 92 Ohio St.3d 191, 203, 2001-Ohio-141, 749 N.E.2d 274.

**{¶95}** Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally not admissible at trial. Evid.R. 801(C). However, pursuant to Evid.R. 801(D)(2)(e), "a statement is not hearsay if the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

**{¶96}** "'The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof.'" *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 116, quoting *State v. Carter*, 72 Ohio St.3d 545, 1995-Ohio-104, 651 N.E.2d 965, paragraph three of the syllabus. Evid.R. 801(D)(2)(e) does not require that explicit findings of the conspiracy be made on the record. *Were*. "The premature admission of such a statement is harmless error if the state subsequently supplies the requisite independent proof of a conspiracy." *Carter* at 550.

**{¶97}** A prima facie case is made where the evidence introduced is sufficient to support, but not compel, a particular conclusion, and which only furnishes evidence that the jury may consider and weigh, but need not accept. *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 107, citing *State v. Martin*, 9 Ohio App.3d 150, 458 N.E.2d 898 (11th Dist.1983), citing *Cleveland v. Keah*, 157 Ohio St. 331, 105 N.E.2d 402 (1952).

**{¶98}** "The proponent of the statement must establish: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was in furtherance of the conspiracy." *Braun* at ¶ 108, citing *State v. Milo*, 6 Ohio App.3d 19, 451 N.E.2d 1253 (10th Dist.1982).

**{¶99}** In this case, the state set forth a prima facie case by independent proof of a conspiracy, at the very least, between Johnson and Coleman. Johnson participated in the

conspiracy because he traveled to Cleveland at Coleman's request, and Coleman participated in the conspiracy because she orchestrated the events by calling Johnson. Green and Howard both testified that Coleman was calling and texting Johnson while they were in the Dog Pound bar after her confrontation with Coates. When Howard was asked how he knew she was calling Johnson, Howard responded, "cuz she was mad" and because Coates "had hit her." Green further testified that after Coates pushed Coleman up against a wall, Coleman stated "that Coates wanted to fight like a bitch," so she was going to call her "brother," who was later identified as Johnson.

{¶100} Coleman's statements to Gale were made in the course of the conspiracy because Coleman had already called Johnson to come to Cleveland; and the statement was made in furtherance of the conspiracy because it explained why Johnson was coming to Cleveland and would explain why Coleman was "calm," according to Gale. Additional evidence of a conspiracy existed because Coleman, her children, and Gale left the scene with Johnson after Coates was shot.

{¶101} Even if the admission of Gale's testimony regarding Coleman's statements was error, the jury heard testimony that Johnson approached Coates with a gun and admitted to shooting Coates. Therefore, Coleman's purpose in having Johnson come to Cleveland was irrelevant.

{¶102} As for Johnson's argument that this testimony violated his right to confrontation, this court explained in *Braun* that "the Confrontation Clause is not violated by the admission of statements made by a co-conspirator in furtherance of the

conspiracy." *Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 115-118. Furthermore, we note that Coleman, the declarant, testified at trial and was subject to cross-examination; thus, Johnson was able to confront Coleman about the statements she made to Gale.

**{¶103}** Accordingly, Johnson's second assignment of error is overruled.

### III. Jury Instruction

**{¶104}** In his third assignment of error, Johnson contends that the trial court erred in giving a flight instruction to the jury because no evidence existed showing that he took additional affirmative steps to evade detection and apprehension by the police.

**{¶105}** Because defense counsel did not object to the instruction, this assignment of error will be addressed under the plain error standard of review. Crim.R. 52(B); *In re: J.G.*, 2013-Ohio-583, 986 N.E.2d 1122, ¶ 10 (8th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

**{¶106}** In this case, the trial court gave the following instruction to the jury on flight:

Consciousness of guilt. Testimony has been admitted indicating that the defendant fled the scene. You are instructed that the fact that defendant fled the scene alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness and/or awareness of guilt. If you find that the facts do not support that the defendant fled the scene or if you find that some other motive prompted the defendant's conduct, or if you are

unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by consciousness and/or an awareness of guilt, you may, but are not required to consider that evidence in deciding whether the defendant is guilty of the crime charged. You alone will determine what weight, if any, to give this evidence.

**{¶107}** Similar versions of this flight instruction have been upheld by this court in numerous cases, including *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, *State v. Vanderhorst*, 8th Dist. Cuyahoga No. 97242, 2012-Ohio-2762, ¶ 55, and *State v. Hamilton*, 8th Dist. Cuyahoga No. 86520, 2006-Ohio-1949. However, the instructions given in those cases were upheld because the evidence demonstrated that the instruction was warranted.

**{¶108}** "[A] mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found." *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, quoting *State v. Norwood*, 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 Ohio App. LEXIS 4420 (Sept. 30, 1997).

**{¶109}** In *Norwood*, the court found that the flight instruction was error, albeit harmless error, because the defendant did not "leave the general area in which he may have normally been found. Additionally, we do not equate appellant's attempt to hide in

[a friend's] kitchen with flight." *Id*. at *15. The court further found that "the facts are also insufficient to justify a flight instruction because appellant did not flee to a situs where he could not have been easily located." *Id*. at *15-16. Accordingly, it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime.

{¶110} In this case, the evidence did not warrant a flight instruction. Johnson's leaving the scene was not deliberate flight in the sense of evading police and detection. In fact, everyone except Green and Fussell left the scene of the shooting. After leaving Green's house, Johnson drove Coleman and Gale home, then went to his own home. Johnson did "not flee to a situs where he could not have been easily located"; rather he went home — a location where he normally could be found until he turned himself in after being apprised of the warrant for his arrest. Accordingly, we find the trial court erred in giving the jury the flight instruction.

{¶111} Under our plain error review, however, we cannot say that this error by the trial court affected the outcome of the case. The instruction, although improper, ultimately allowed the jury to determine the defendant's motivation in leaving the scene. The jury heard the testimony that everyone left the scene of the shooting, with Johnson driving Coleman, her children, and Gale (who had been stabbed) home.

{¶112} Accordingly, we overrule Johnson's third assignment of error.

IV. Prosecutorial Misconduct

{¶113} Johnson moved for a mistrial after the jury began deliberations on the basis that the prosecutor used the cell phone records for exactly what the trial court suggested should be avoided during closing arguments — the cellular towers and the significance of their locations. Johnson found issue not in the prosecutor pointing out the cell phone towers on the map, but that the prosecutor used the information to infer that Johnson was "lying in wait" to murder Coates.

> What is at issue is he said that, therefore, then can be interpreted as proof that the defendant lying in wait. And then looked at the jury and said, if a person lies in wait, it's premeditated, it's aggravated, it's murder. And I believe that that misconduct rises to the level of a mistrial.

(Tr. 967.)

{¶114} The trial court denied the motion, stating that it was most concerned that the cell phone records would be used to track Johnson's travel from Akron to Cleveland. Having found that the prosecutor did not use the records for this purpose, the court found no misconduct. Furthermore, the court noted the independent testimony that placed Johnson at the scene and that the testimony revealed he was there only for pickup purposes and not for any nefarious reasons, such as to commit a crime. Accordingly, the court found no material prejudice.

{¶115} In his fourth assignment of error, Johnson contends that "the trial court erred in failing to grant a mistrial due to prosecutorial misconduct, in violation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution."

{¶116} Specifically, Johnson contends that the state engaged in misconduct during closing argument when it used the cell phone records improperly by creating new demonstrative evidence by enlarging the phone records which, according to Johnson, were manipulations of the actual records. Johnson argues that these enlarged versions of the cell phone records included information provided by the state that caused them to be "labeled" and included a "legend" to interpret the calls, and "a map."

{¶117} The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether it prejudicially affected the substantial rights of the accused. *State v. Jones*, 90 Ohio St.3d 403, 420, 2000-Ohio-187, 739 N.E.2d 300. The affect of the alleged misconduct must be judged in the context of the entire trial and not treated as an isolated incident in an otherwise properly tried case. *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 58. Accordingly, an appellate court should only reverse a conviction if the effect of the misconduct "permeates the entire atmosphere of the trial," such that the defendant has been denied a fair trial. *Id*., citing *State v. Tumbleson*, 105 Ohio App.3d 693, 696, 664 N.E.2d 1318 (12th Dist.1995). In analyzing whether a defendant was deprived of a fair trial, an appellate court must determine beyond a reasonable doubt whether, absent the improper conduct of the prosecutor, the jury would have found the defendant guilty. *See Maurer*, 15 Ohio St.3d at 266-267, 473 N.E.2d 768.

{¶118} While the enlarged cell phone records, manipulations thereof, and explanations were questionable, we cannot find the harm to Johnson, nor has Johnson

explained how these enlargements were prejudicial or affected the outcome of the case. First, our review of the record shows that the state used the cell phone records to support its theory that Johnson's conduct was premeditated — with prior calculation and design, to prove their case for aggravated murder. The jury found Johnson not guilty of aggravated murder; thus, it can be necessarily inferred that they felt that Johnson's conduct was not premeditated, and any inference about him "lying in wait" was harmless.

{¶119} Morever, the defense theory of the case was that Johnson was present at Green's house that evening, but that he was not the shooter. Therefore, the route that Johnson took from Akron to Cleveland was irrelevant. Finally, because the jury acquitted Johnson of aggravated murder, Johnson's challenge to the trial court's denial of his request for a mistrial is without merit.

{¶120} Johnson's fourth assignment of error is overruled.

## V.   Effective Assistance of Counsel

{¶121} In his fifth assignment of error, Johnson contends that he "was denied the effective assistance of counsel, in violation of his right to counsel, and defendant's right to due process of law, as protected by the Sixth and Fourteenth Amendments to the United States Constitution."

{¶122} Johnson claims his counsel was ineffective for failing to object to (1) the hearsay testimony, which was his second assigned error; (2) the jury instruction on flight, which was his third assigned error; and (3) the state's closing argument, which was his fourth assigned error.

{¶123} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶124} Johnson first claims his counsel was ineffective for failing to object to hearsay testimony. As discussed in his second assignment of error, the testimony was admissible as non-hearsay because it was made by a co-conspirator. Therefore, counsel's failure to object would have been futile.

{¶125} Nevertheless, a review of the record demonstrates that counsel did object when the state attempted to question Gale again about Coleman's statements. *See* tr. 632. However, after a side-bar discussion, counsel withdrew his objection. On cross-examination, counsel explained why he withdrew his objection — as a strategic tactic to support the defense theory that Gale actually called Johnson that evening. *See* tr. 640. According to the defense, the cell phone records indicated that Gale's phone was used to call Johnson, and although the state argued that Coleman was using Gale's phone while seated in Gale's car, Gale's records further showed that the calls were being made

to Johnson prior to Coleman allegedly using Gale's phone. Accordingly, we find counsel's failure to object or his subsequent withdrawal of the objection was for strategic purposes; thus, it cannot be deemed as ineffective.

{¶126} Johnson contends counsel was also ineffective for failing to object to the jury instruction. As discussed under Johnson's second assignment of error, the trial court erred in instructing the jury on flight because the evidence did not support such instruction; therefore, an objection to that instruction would not have been futile. However, the error was harmless considering the instruction as a whole allowed for the jury to conclude that Johnson's departure from the scene was motivated by other factors, including that Gale had been stabbed or to remove Coleman's children from the scene.

{¶127} In his final argument, Johnson maintains counsel was ineffective for failing to object to the state's closing argument, specifically about the cell phone records. Johnson also contends that counsel should have requested a curative instruction after their use in closing argument. As discussed under Johnson's fourth assignment of error, the state was unsuccessful in its use of the enlarged cell phone records. Therefore, the failure to object was harmless.

{¶128} Moreover, counsel's request for a curative instruction at that point would have been prejudicial. Asking for a curative instruction would have heightened the juror's awareness of the significance of the cell phone records and their importance in proving premeditation. Rather, counsel acted appropriately in requesting a mistrial based on the perceived prejudicial effect of the enlarged and summarized cell phone records.

**{¶129}** Based on the record before this court, we cannot say that Johnson was denied the effective assistance of counsel to the extent that he was prejudiced and the result of the trial would have been different. Johnson's fifth assignment of error is overruled.

## VI. Cumulative Error

**{¶130}** In his sixth assignment of error, Johnson contends that "the proceedings below denied [him] of his right to a fair trial under [the] Fifth, Sixth and Fourteenth Amendments to the United States Constitution, because of cumulative errors during the trial of this case."

**{¶131}** The "cumulative error" doctrine states that a "conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the numerous instances of the trial court errors do not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 1995-Ohio-168, 656 N.E.2d 623. In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Viceroy*, 8th Dist. Cuyahoga No. 97031, 2012-Ohio-2494, ¶ 21, citing *State v. Clark*, 8th Dist. Cuyahoga No. 89371, 2008-Ohio-1404, ¶ 62.

**{¶132}** Although we found that the trial court erred in giving a flight jury instruction, we found that this error did not rise to the level of reversible error.

Accordingly, having found no other causes for reversal, this doctrine is not applicable to this case. Johnson's sixth assignment of error is overruled.

**{¶133}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
EILEEN A. GALLAGHER, J., CONCUR

KEY WORDS:

Confrontation clause, hearsay, statement by co-conspirator, Evid.R. 801(D)(2)(e), flight jury instruction. Defendants right to confront witnesses was not violated where statement was admissible pursuant to Evid.R. 801(D)(2)(e), a statement made by a co-conspirator. Additionally the declarant of the statement testified at trial and was subject to cross-examination. Trial court erred in giving the jury an instruction on flight

because the evidence did not support such instruction.   However, this error did not rise to the level of plain error to warrant reversal.