[Cite as *State v. Heineman*, 2016-Ohio-3058.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 103184

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## SEAN HEINEMAN

DEFENDANT-APPELLANT

---

### JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-591742-A

**BEFORE:** Blackmon, J., E.T. Gallagher, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 19, 2016

**ATTORNEYS FOR APPELLANT**

Ian N. Friedman
1360 East 9th Street
Suite 650
Cleveland, Ohio 44114

Russell S. Bensing
Joseph A. Delguyd
Eric C. Nemecek
1360 East 9th Street
Suite 650
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Edward R. Fadel
Brent Kirvel
Daniel T. Van
Assistant County Prosecutors
9th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1}  Sean Heineman ("Heineman") appeals from his convictions for multiple sex-related offenses and assigns nine errors for our review.[1]  Having reviewed the record and pertinent law, we affirm Heineman's convictions.  The apposite facts follow.

**Facts and Procedural History**

{¶2}  In 1996, 30-year-old Heineman married 19-year-old N.M., who is one of seven siblings.  N.M.'s youngest sister, E.M., was six years old at the time Heineman and N.M. were married.  The couple lived with N.M.'s family in her parents' house for the first two-to-three years of their marriage.

{¶3}  In 2014, E.M. told a counselor, and subsequently her family and the authorities, that Heineman had sexually abused her from 1996 to 2005, when she was six-to-15 years old.  The abuse occurred at N.M.'s family home in 1996, at the condominium that Heineman and N.M. lived in from 1999 to 2001, and back at the family home, which Heineman and N.M. bought from N.M.'s parents, from 2001 to 2005.  E.M. also revealed that in 2010 and 2011, when she was an adult, she and Heineman had a sexual relationship while her sister, N.M., and Heineman were still married.

{¶4}  In August 2014, Heineman was indicted for multiple counts of sexual offenses.  A superseding indictment was issued in December 2014, alleging the following offenses: 15 counts of gross sexual imposition of a victim under 13 years old in violation of R.C. 2907.05(A)(4); six counts of rape of a victim under 13 years old in violation of R.C. 2907.02(A)(1)(b); three counts of importuning in violation of R.C.

---

[1] *See* appendix.

2907.07(C); and nine counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A).

{¶5} On June 16, 2015, a jury found Heineman guilty of all counts except the three importuning charges, and the court sentenced him to an aggregate of 35 years in prison.

{¶6} At trial, E.M. testified that the first time Heineman inappropriately touched her was in the fall of 1996 at the family home. E.M. was six years old, and she slept in the bed with N.M. and Heineman. According to E.M., Heineman touched her on the belly, chest, and vaginal area. Heineman called these touches "tickle scratches."

{¶7} E.M. next testified about several incidents when Heineman abused her in his and N.M.'s condo, starting in the summer of 1999. According to E.M., she and her brother N.K.M. would often sleep at N.M. and Heineman's condo. She testified that most of the incidents occurred on a brown leather couch under a blanket and involved Heineman touching E.M. with "tickle scratches." By this time, however, Heineman also had E.M. give him "tickle scratches," starting with his abdomen and working down to his penis.

{¶8} E.M. next testified that in 2001, she, N.K.M., and her parents moved to Florida. According to E.M., she came back to Cleveland for a visit in December 2011. She was 11 and Heineman was 35. She stayed at the family home, which N.M. and Heineman had recently purchased. E.M. and Heineman laid on the same couch and under the same blanket as in the condo. N.M. had gone to bed. Heineman started the

familiar pattern of "tickle scratches," and this time it escalated to vaginal intercourse. E.M. testified that she was wearing "white and red striped pajama pants and a matching red long-sleeved top." E.M. testified with the same detail about incidents that occurred when she returned to Cleveland in 2002, 2003, 2004, and 2005. E.M. testified that she did not return to Cleveland in the summer of 2006. According to E.M., Heineman sexually abused her "probably hundreds of times."

{¶9} At trial, several of E.M. and N.M.'s family members testified to the following: As many as 12-to-15 people lived in the family home, including two parents, who were "ultra conservative Christians," seven siblings, Heineman, and several international students attending Case Western Reserve University. The children were mostly homeschooled, although according to one sibling, "[t]here was little to no structure" to this. The children were not under the care of a pediatrician or other medical practitioner, and at least two of them moved out of the house and lived independently before they were 18. The children were sheltered and had no form of sex education growing up.

{¶10} When E.M. was two or three years old, her brother M.M., who was 12 or 13 at the time, molested her. The testimony is inconsistent as to exactly what happened. However, the family consistently testified that some type of molestation incident occurred, the parents told the older siblings that M.M. should not be alone with E.M., and the issue was never discussed again.

{¶11} According to almost all family members, there was "something weird" about Heineman's relationship with E.M., who was six-to-nine years old during the time they all lived in the family house together. E.M. was fond of sitting on people's laps when she was a little girl, but she sat on Heineman's lap more than others. Sometimes, E.M. and her brother N.K.M. would sleep in Heineman and N.M.'s bedroom. One brother testified that Heineman would hold and touch E.M. inappropriately, and another brother testified that E.M. "seemed to have one of those little 6-year-old, 7-year-old * * * crushes on" Heineman. According to E.M. and N.M.'s mother, Heineman "did not participate with the family [and] he was cold, you know, and just detached * * *," but he "paid attention * * * almost, well exclusively to [E.M.]"

{¶12} From 1999 to 2001, when E.M. was approximately nine-to-11 years old, it was "not uncommon" for E.M. and N.K.M. to spend the night at Heineman and N.M.'s condo. N.K.M. testified that Heineman and E.M. would "massage" each other under a blanket on the couch while they were watching television.

{¶13} Additional testimony will be analyzed when needed under Heineman's assigned errors.

## Expert or Fact Witness

{¶14} In his first assigned error, Heineman argues that Dr. Darlene Dempster, who testified as a fact witness for the state, improperly gave expert opinion testimony. Dr. Dempster is the victim's treating psychologist, and it is undisputed that, in the case at hand, she was not qualified as an expert witness pursuant to Evid.R. 702.

{¶15} "A trial judge has wide discretion when determining the admissibility of * * * evidence, and will not be disturbed on appeal absent a clear showing of abuse of discretion." *Renfro v. Black*, 52 Ohio St.3d 27, 32, 556 N.E.2d 150 (1990). However, pursuant to Evid.R. 701, opinion testimony by lay witnesses "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Furthermore, while Evid.R. 803(4) renders statements made by a patient to a medical provider "for purposes of medical diagnosis or treatment" admissible, the rule cannot be used to admit a treating physician's opinion testimony. *See Guarino-Wong v. Hosler*, 1st Dist. Hamilton No. C-120453, 2013-Ohio-1625, ¶ 10.

{¶16} Courts have used these evidentiary rules "to permit treating physicians to render opinions based upon their personal observations and perceptions." *Williams v. Reynolds Rd. Surgical Ctr.*, 6th Dist. Lucas No. L-01-1144, 2004-Ohio-1645, ¶ 9. However, "where a treating physician has been properly identified as a fact witness prior to trial, the treating physician * * * may not testify as an expert as to the ultimate question" in the case. *Hurst v. Poelstra*, 2d Dist. Miami No. 94-CA-61, 1995 Ohio App. LEXIS 5812 (Dec. 22, 1995). Additionally, the witness may not testify as to his or her opinion of the truthfulness of the victim's statements. *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989). "In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and

veracity of witnesses." *State v. Eastham*, 39 Ohio St.3d 301, 312, 530 N.E.2d 409 (1988) (H. Brown, J., concurring).

{¶17} In the case at hand, the trial court found admissible Dr. Dempster's testimony that "the behavior of an alleged child victim of sexual abuse is consistent with behavior observed" in sexually abused children in general pursuant to *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998). Although the court reiterated an accurate statement of the law, *Stowers* applies to expert witness testimony, and it is undisputed that Dr. Dempster did not testify as an expert witness. Nonetheless, we review her testimony under the parameters set forth in Evid.R. 701 and 803(4), as well as the applicable case law.

{¶18} Dr. Dempster testified at length in answering the following question posed by the state: "[W]ere you in a position professionally through your experience and training to respond to [E.M.'s] request for services [regarding childhood sexual abuse] with appropriate treatment or therapy?" Dr. Dempster then testified about the "potential therapies" that could be offered to a patient who presents with a complaint of childhood sexual abuse, as well as about the symptoms and treatments typical of people who have been sexually abused.

{¶19} Dr. Dempster next testified about E.M.'s recollection of the alleged abuse by Heineman, including various times when the abuse "escalated" and the concept of "delayed reporting." During this testimony, the following questions were asked and answered: "So in your personal professional experience, prior to [E.M.], have you treated

patients with these types of characteristics of delayed reporting that you just described for us?"; "[I]n your personal professional experience, prior to [E.M.], have you treated people who had emotionally bonded with their abuser?"; and "[A]re there any other characteristics that are hallmarks in the professional literature or through your personal experience that indicate a typical pattern of child sex abuse that we have not discussed to this point?"

**{¶20}** Upon review, we find that Dr. Dempster testified as both a fact and expert witness. She testified, in part, as to what E.M. told her and her perception and treatment of E.M. in response to E.M.'s disclosures. This testimony is admissible as to a fact witness under Evid.R. 701 and 803(4).

**{¶21}** Additionally, the prosecutor asked, based on E.M.'s "information * * * provided to you for the purposes of counseling, did you recognize the hallmarks or the characteristics of childhood sexual abuse as you already covered in her own personal area?" Dr. Dempster answered, "Yes. Hearing the full story from beginning to end with her, her emotional express was consistent with what she was sharing. * * * Everything made sense according to development, * * * her experiences, the level of coercion used, the type of coercion used." Asked in summation if E.M.'s "narrative history" was consistent with Dr. Dempster's "knowledge, experience and training on the subject of child sex abuse," Dr. Dempster stated, "Yes, it was."

**{¶22}** Dr. Dempster did not expressly answer the ultimate question of whether, in her opinion, Heineman sexually abused E.M. nor did she expressly testify as to E.M.'s

truthfulness. When Dr. Dempster explained, via her "personal professional experience," the symptoms, effects, diagnosis, and treatment of typical sexual abuse victims, she was testifying as an expert witness. However, because Dr. Dempster was declared a fact witness, no expert report under Crim.R. 16(K) was provided to defense counsel. The issue becomes whether the omission of this report was prejudicial to Heineman.

{¶23} In *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 45, the court opined that, "[b]ecause the victim's medical records * * * had been provided to the defense, this appears to be a case where the disclosure of the medical records in lieu of an expert report adequately provided the requesting party with the information it needed." The court found that the treating physician testified consistently with the medical records and did not testify as to the cause of the victim's injury. The court concluded that the defendant "cannot claim he was prejudiced by a lack of Crim.R. 16(K) report, as he was not ambushed or thwarted in his ability to cross-examine the physician — a situation Crim.R. 16(K) is intended to prevent." *Id.* at ¶ 46.

{¶24} Additionally, Loc.R. 21.1(C) states, in part, as follows: "In the event the non-party expert witness is a treating physician, the Court shall have the discretion to determine whether the hospital and/or office records of that physician's treatment which have been produced satisfy the requirements of a written report."

**{¶25}** In the case at hand, Dr. Dempster provided the parties with her notes regarding E.M.'s counseling sessions.[1] Dr. Dempster testified consistently with the medical records regarding her perceptions and observations of E.M., and defense counsel questioned her during cross-examination. The Ohio Supreme Court has permitted

> witnesses with firsthand knowledge to offer lay opinion testimony "where they have a reasonable basis — grounded either in experience or specialized knowledge — for arriving at the opinion expressed." * * * It is consistent with this emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702.

(Citation omitted.) *State v. McKee*, 91 Ohio St.3d 292, 296-297, 744 N.E.2d 737 (2001).

**{¶26}** Upon review, we cannot say that the court abused its discretion in admitting Dr. Dempster's testimony. Furthermore, even assuming arguendo that the trial court improperly admitted portions of Dr. Dempster's testimony, we find that any resulting error was harmless. The "mere finding of a violation" of rights

> does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [improperly admitted evidence] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper * * * admission was harmless error.

*Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

**{¶27}** "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed 593 (1953). In the case at hand,

---

[1]We recognize that Dr. Dempster failed to supplement E.M.'s medical records prior to trial. However, the supplemental notes concern E.M.'s disclosures to Dr. Dempster, which are admissible under Evid.R. 803(4), regardless of whether the witness is giving expert or fact testimony.

E.M. testified in detail about Heineman sexually abusing her. Her testimony was consistent and credible, and, standing alone, supports Heineman's convictions of the charges against him. Furthermore, any characterization of Dr. Dempster as an "expert" witness during the state's closing argument was likewise harmless, because it was not evidence for the jury to consider, and the court gave a curative instruction to the jury on this point. *See State v. Nields*, 93 Ohio St.3d 6, 40, 752 N.E.2d 859 (2001) ("[t]he trial court cured any error by reminding the jury that the arguments of counsel are not evidence, and it was for them to determine what the evidence showed"). Accordingly, Heineman's first assigned error is overruled.

## Violation of Crim.R. 16

{¶28} Heineman's argument under this assigned error is twofold. First, that the state violated its duty to supplement discovery under Crim.R. 16(A) when it failed to provide him in advance of trial with 45 pages of E.M.'s medical records dated subsequent to the initial records request. Specifically, Heineman's concern is the reference in Dr. Dempster's notes that E.M. disclosed to her that she was molested by one of her brothers when she was very young. According to Heineman, this was prejudicial because he was not given the opportunity to cross-examine E.M. about her disclosure, nor was he given the opportunity to seek rebuttal evidence.

{¶29} Pursuant to Crim.R. 16(B)(1)(f), the state is required to disclose "[a]ny evidence favorable to the defendant and material to guilt or punishment * * * ." Additionally, Crim.R. 16(A) states in pertinent part that "[o]nce discovery is initiated by

demand of the defendant, all parties have a continuing duty to supplement their disclosures." However, "prosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 131.

**{¶30}** In the case at hand, Dr. Dempster's notes from her counseling sessions with E.M. were provided to the state, and in turn to defense counsel, in August 2014. However, when Dr. Dempster was testifying, it became apparent that there were 45 additional pages of notes regarding sessions with E.M. subsequent to August 2014, and neither party had these supplemental notes. Included in the supplemental notes was a reference to E.M.'s disclosure that when she was three years old, her 13-year-old brother "molested her orally on numerous occasions."

**{¶31}** Concerning this issue, Dr. Dempster testified that there was one isolated reference in her notes regarding E.M. being abused by her brother. Dr. Dempster explained that this "wasn't as bothersome to [E.M.] because he was young when it happened. It only happened a few times and he came from the same dysfunctional family she did." Dr. Dempster further explained that this was not "a major issue in counseling" E.M., and it "wasn't as disruptive to her as the subsequent abuse that she experienced" by Heineman.

**{¶32}** The allegation that E.M. was molested by her brother was not unknown to Heineman before trial. According to defense counsel, "the idea that something like this had occurred" was brought up prior to trial in an interview of N.M. Defense counsel stated on the record, "I just had heard somewhere some rumblings to the effect there was an allegation against [E.M.'s brother], no details." What was unknown to the defendant at the time of trial was that E.M. had spoken, albeit briefly, to Dr. Dempster about it.

**{¶33}** Additionally, Dr. Dempster was not the first witness to testify about this alleged molestation. Several of E.M.'s family members, who testified prior to Dr. Dempster, stated that they were aware of an incident regarding E.M. being molested by one of her brothers. Furthermore, E.M., who also testified prior to Dr. Dempster, discussed her recollection of the incident.

**{¶34}** Defense counsel objected, arguing that had they seen the doctor's supplemental notes before trial, they would have contacted an expert about what effect, if any, being molested by her brother may have had on E.M. Defense counsel also made it clear that the state of Ohio did not intentionally withhold the supplemental counseling notes. "Now, again, I will make the record very clear, as I did yesterday, I do not believe there was any foul play or intentional — I don't think there was any gamesmanship by our colleagues from the prosecutor's office. I want to make that very clear."

**{¶35}** In response to the objection, the court permitted defense counsel to recall any witness who previously testified about E.M. being molested by her brother in light of

Dr. Dempster's notes. Heineman did not recall any witness to the stand. The court additionally stated the following:

> I would also note that the defense has hired a very proficient, a professional team that included investigators that were on the ground * * * inquiring of witnesses. I believe they could have inquired of Dr. Dempster * * *." Finally, nothing would have prevented [the defense] from retaining this expert at this point anyway because you could have discussed with that expert whether an alleged victim, a victim who was victimized six to 16 could have the very maladies that you described * * *.

{¶36} Upon review in light of Crim.R. 16 and *State v. Jackson*, we find, as defense counsel pointed out during trial, that the state's failure to supplement the record was not willful, and that Heineman suffered no prejudice by not knowing that E.M. disclosed prior abuse to Dr. Dempster. This is particularly supported by the notion that the molestation allegation itself did not take defense counsel by surprise — just the fact that E.M. disclosed the allegation to her doctor. Additionally, there is overwhelming evidence of Heineman's guilt, including E.M.'s detailed account of the abuse, corroborating testimony from family members, and recorded conversations between E.M. and Heineman. "Ohio courts have consistently held that a victim's testimony, if believed, is sufficient to support a rape conviction." *State v. Williams*, 8th Dist. Cuyahoga No. 92714, 2010-Ohio-70, ¶ 32.

**{¶37}** Heineman's second argument under this assigned error is that the state violated Crim.R. 16(K) when it failed to provide an expert report for Dr. Dempster, who, in effect, testified as an expert. Given the disposition of Heineman's first assigned error, this argument is rendered moot under App.R. 12(A)(1)(c). Accordingly, Heineman's second assigned error is overruled.

## Prosecutorial Misconduct

**{¶38}** In his third assigned error, Heineman argues that the state committed prosecutorial misconduct during its closing arguments when it implied that Heineman's failure to present rebuttal testimony was an admission of guilt. Specifically, Heineman points to the following statement made by the prosecutor: "[W]e have not heard from any defense psychologist that has somehow tied together what [defense counsel] has been saying of this mixed memory and she's confused and has been molested by her brother, so it's made her want to set Sean Heineman up later on in life, some 20 years later."

**{¶39}** "The test for prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "The closing argument must, however, be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial." *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). Furthermore, although the prosecution may not comment on the defendant's silence, "[t]he prosecution is not prevented from commenting upon the

failure of the defense to offer evidence in support of its case." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986).

**{¶40}** Upon review, we cannot say that the prosecutor's closing argument was improper. Defense counsel's closing argument was based, in part, on testimony that E.M.'s brother sexually abused her "and how that may have affected her and the behaviors * * * that would lead someone to lodge a false allegation against someone * * *." The prosecutor's statement that Heineman takes issue with was made during the state's rebuttal closing argument and was directed at the lack of evidence supporting Heineman's theory. Accordingly, Heineman's third assigned error is overruled.

## Flight Jury Instruction

**{¶41}** In his fourth assigned error, Heineman argues that the court incorrectly provided the jury with a flight instruction.

**{¶42}** "A trial court should give a proposed jury instruction if it is a correct statement of the law and is applicable to the facts of the particular case." *State v. Rose*, 8th Dist. Cuyahoga No. 89457, 2008-Ohio-1262, ¶ 18. "Flight from justice 'means some escape or affirmative attempt to avoid apprehension.' It is not error for a trial court to give a flight instruction when there is such evidence." (Citations omitted.) *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 44. To warrant a flight instruction, there must be evidence "that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime." *State v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, ¶ 109.

**{¶43}** Cleveland Heights Police Detective Michael Reese testified that on August 9, 2014, he got an arrest warrant for Heineman after listening to taped conversations between Heineman and E.M. Det. Reese attempted to locate Heineman through his cell phone GPS coordinates, but Heineman's phone was turned off. Other officers went to Heineman's house, but could not locate him. Heineman's mother was staying at his house, and she subsequently told Heineman that the police were there looking for him.

**{¶44}** Det. Reese went back to Heineman's house later that day in an unmarked car and saw Heineman's SUV back out of the driveway. The police stopped the vehicle, suspecting that Heineman was driving, but the driver was Heineman's mother. According to Det. Reese, "an arrangement was made with her and the defendant to switch vehicles."

**{¶45}** In the presence of the police, Heineman's mother called Heineman's father in an effort to locate Heineman. According to Det. Reese, Heineman's father "was adamant that [Heineman] was not there." After further conversation with Heineman's mother, Det. Reese determined "that there was a strong possibility [Heineman] was at [his father's] house." Heineman's father's house is located in Brimfield Township, about 40 miles south of Cleveland. Det. Reese contacted the Brimfield Police Department, and they sent officers to pick up Heineman, who was indeed at his father's house.

**{¶46}** Heineman testified that upon learning from his mother that the police were looking for him, he called an attorney. The attorney was not able to find out why the police were looking for Heineman because it was the weekend. According to Heineman,

the attorney told him to "go about your business" and contact the police first thing Monday morning. Heineman testified that he went to his father's house because he wanted to get his children "to a place where they could be safe. * * * [S]omewhere where there wouldn't be any incidents."

{¶47} In this case, the court instructed the jury on flight as follows:

Testimony has been admitted indicating that the defendant fled the seen [sic]. You are instructed that the fact that the defendant fled the scene does not raise a presumption of guilt. It may tend to indicate that the defendant's consciousness of guilt. If you find that the facts do not support that the defendant fled the scene or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose whatsoever. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt, you may but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

{¶48} Upon review, we find that there was sufficient evidence in this case to warrant a flight instruction, and the court properly instructed the jury on how to weigh this evidence. Accordingly, Heineman's fourth assigned error is overruled.

**Hostile or Adverse Witness**

{¶49} Heineman argues in his fifth assigned error that the court improperly ruled his ex-wife N.M. a hostile or adverse witness, thus allowing cross-examination, during the state's case-in-chief. During N.M.'s testimony, the court stated the following:

And I will explain to the jury that when a witness is adverse to a potential party, whether it's the State or the defense, the court has the option of declaring them hostile to the interest of the person questioning them. So at

this point, I'm permitting the State of Ohio to cross-examine this witness because I believe her interests are adverse to the state.

{¶50} "Generally, evidentiary rulings made at trial rest within the sound discretion of the trial court. We give substantial deference to the trial court [absent] an abuse of discretion * * * , [which] will not be found when the trial court makes the correct decision, however, gives the wrong reason * * * ." (Citations omitted.) *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, ¶ 12.

{¶51} Pursuant to Evid.R. 611(C), "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." However, leading a witness to develop testimony is different than impeaching a witness with his or her prior inconsistent statement. Evid.R. 607 states that "the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." *See also* Evid.R. 613.

{¶52} Heineman argues that N.M. was neither a hostile nor an adverse witness for the state. N.M.'s testimony, however, shows otherwise. "An 'adverse witness' is one who identifies with the opposing party because of a relationship or a common interest in the outcome of the litigation." *Darkenwald* at ¶ 15.

{¶53} N.M. testified that her sister E.M.'s "allegations * * * are absolutely physically impossible. Even if I thought [Heineman] did it, which I do not — I know him very well. I know him better than anyone." Asked if she was "aligned with [Heineman's] version of the allegations and not your sister's," N.M. responded, "I'm

aligned with the truth, yes. * * * The evidence in my opinion favors [Heineman]." She further testified as follows: "I know my family very well. Some are truthful and some are not truthful at all. So there's certain people I would trust." According to N.M., her family is motivated to "destroy" or "hurt" Heineman.

{¶54} N.K.M. testified that "[N.M.] never liked [E.M.]. From when I was six or eight years old on, I remember there was palpable tension between them, and I never understood why." Upon learning of E.M.'s allegations against Heineman, N.M. initially expressed remorse and offered support to E.M. However, N.M. testified that "within a day, * * * I started changing my mind or my gut." Asked if she were to hear a tape of Heineman "apologizing and so forth extensively in the face of allegations of molesing [E.M.] from the ages of six on up into the teens, * * * that he's expressing remorse, concerns, apologizing, would your opinion change a little to the believability" of E.M., N.M. testified that "I would not be inclined to change my mind."

{¶55} N.M. and Heineman divorced in 2013 after 17 years of marriage. N.M. testified that since their divorce, Heineman pays her $13,500.00 monthly in support. Additionally, her portion of the property settlement was $1.45 million, although this is owed to her in "separate payments." Without being asked specifically, N.M. testified that she was "financially protected in any outcome of this case * * * and would actually benefit financially if [Heineman] went to prison." In response, the prosecutor stated, "It sounds like you * * * were just waiting to say that. * * * You knew the subject of * * *

your financial ties to [Heineman] are so significant that taking the witness stand, you went over this and had * * * ready formed made answers * * *."

**{¶56}** Upon review, we find no error in the court's determining that N.M. was an adverse witness.

**{¶57}** We now turn to Heineman's next argument under this assigned error, namely that the trial court erred by permitting the state to impeach N.M with extrinsic evidence. Specifically, Heineman challenges the following evidence: the recorded phone call between N.M., E.M., and N.K.M.; text messages sent from N.M.'s phone to E.M.'s phone; and the recorded conversations between E.M. and Heineman.

**{¶58}** First, it is axiomatic that "the right to cross-examine an adverse witness, which includes the right to impeach, is essential to a fair trial and due process." *State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 30. *See also Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 297 (1973); *State v. Green*, 66 Ohio St.3d 141, 609 N.E.2d 1253 (1993).

**{¶59}** Additionally, a witness's credibility or character for truthfulness may be attacked using opinion and reputation evidence and specific instances of conduct pursuant to Evid.R. 608. Furthermore, Evid.R. 616(A) states that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by the examination of the witness or by extrinsic evidence." *See, e.g., State v. Powers*, 9th Dist. Summit No. 23400, 2007-Ohio-2738, ¶ 22 (impeachment under Evid.R. 616(A) "was

entirely appropriate * * * to test [the witness's] motive and credibility so that the jury could determine why her account of the events had changed").

{¶60} In the instant case, several family members testified regarding N.M.'s "web of lies." N.M.'s testimony was, at times, internally inconsistent and contradictory to the testimony of other witnesses. N.M.'s testimony contradicted the testimony of everyone else in her family regarding the relationship between Heineman and E.M. According to N.M., there was nothing "special" about Heineman's interaction with E.M. over the years. Heineman "wanted nothing to [do] with the kids. He tolerated them because it was important to me."

{¶61} N.M. testified that she asked the brother who allegedly molested E.M. to testify. Asked if she contacted any of her other family members "promoting them to testify," N.M. answered, "No one." When the prosecutor asked N.M. if her focus on this particular brother's testimony was to "possibly throw a wrench into the allegations," N.M. changed her testimony to, "I promoted, asked all my family. They have called and coerced me."

{¶62} N.M. testified that she learned about E.M.'s allegations the night Heineman was arrested. One of her brothers testified that he confronted N.M. about E.M.'s allegations several days before the arrest. N.M. denied that this conversation took place and stated that she would not try to "hide a crime."

{¶63} N.M testified that none of her siblings ever slept in bed with her or Heineman, that she was present "100% of the time" that E.M. stayed with them, and that

E.M. was never in Heineman's presence without N.M. being there.  N.M. testified that E.M. was in her and Heineman's condo "[s]ix to eight [times] the entire time we lived there."  N.M. denied that Heineman "favored" or "doted on" E.M., testifying that he "kind of ignored her."

{¶64} All of this testimony contradicts the testimony of the other witnesses.  For example, E.M. testified that Heineman abused her at the condo at least once a month for two-and-a-half years.  All family members except N.M. testified that Heineman and E.M. had a "special relationship," E.M. and N.K.M. testified that E.M. slept in the bed with Heineman and N.M., and there was corroborating testimony that E.M. and N.K.M. were alone with Heineman, without N.M. being there, many times.

{¶65} Accordingly, we find that N.M.'s character for truthfulness was in question and that the court did not err in allowing the state to impeach N.M. or in ruling on the admissibility of evidence during N.M.'s testimony.  As such, Heineman's fifth assigned error is overruled.

## Admission of Audio Recordings

{¶66} In Heineman's sixth assigned error, he argues that the court erred by admitting audio recordings of conversations between Heineman and E.M. into evidence, because portions of the recordings were of poor quality and unintelligible.  Heineman argues that "the dubious probative value of the [r]ecordings is radically outweighed by their unfairly prejudicial effect * * *."

{¶67} "An audio recording made contemporaneously with events is always the best evidence of that event. * * * [A] person who was present and who heard the conversation in question at the time the recording was made may testify for the purpose of clarifying inaudible or unintelligible portions of the tape." *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 26 (8th Dist.).

{¶68} The recordings in question in this case are of telephone and face-to-face conversations between Heineman and E.M. that occurred between August 5 and August 8, 2014. E.M. recorded the conversations as part of the Cleveland Heights Police Department investigation of her allegations against Heineman. The recordings were played for the jury and introduced into evidence during E.M.'s testimony. The recordings of the telephone conversations were audible, and in the first one, E.M. references losing her virginity "when I was 11 to my brother-in-law." Heineman responded to this by saying, "I don't know what you want me to say. It's not the kind of conversation you have on the phone." Heineman then agreed to meet E.M. in person to discuss this.

{¶69} In the second audible phone conversation, E.M. states that "when we had unprotected sex when I was 12, I got herpes." Heineman's reaction to this was to say that it "doesn't make any sense" and "let's talk tomorrow." E.M. testified that in the recorded conversations, Heineman never denied sexually abusing her.

{¶70} Both recordings of face-to-face conversations between E.M. and Heineman are largely inaudible. As to the first one, the state introduced this into evidence only for

the purpose of establishing that Heineman met with E.M. as planned to discuss her allegations of sexual abuse. As to the final recording, only portions of it were audible and played for the jury. Heineman argues that "none of which was of any consequence to the determination of the ultimate issues before the trier of fact." We disagree with Heineman's characterization as "irrelevant" of the following excerpt from E.M.'s testimony clarifying what was recorded: "I was discussing the abuse of when I was the ages of 11, 12, 13, and [Heineman] made a comment of, well, 30, 40 years ago, kids got married at the ages of 13 or 14, like saying, hey, it's okay if that happened to you, trying to justify it."

{¶71} Both parties to the conversation testified during trial and there was ample opportunity to cross-examine them. Accordingly, we find no error in the admission of this evidence. Heineman's sixth assigned error is overruled.

## Other Acts Evidence

{¶72} In his seventh assigned error, Heineman argues that the court improperly allowed "other acts" evidence in violation of Evid.R. 404(B). Specifically, Heineman argues that the court erred in admitting testimony into evidence regarding his drug use, his "favoring" female employees, his having sex with his wife when she was inebriated, and his statements that he wished his wife's body was more like E.M.'s.

{¶73} Pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Admission of "other acts" evidence is within the discretion of the trial court, and it may be excluded if its prejudicial effect substantially outweighs it probative value. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.2d 10153.

**{¶74}** The testimony in question in this case consists of unsolicited and isolated statements given by witnesses. For example, one of E.M.'s brothers who briefly worked for Heineman was asked to describe Heineman's demeanor or behavior at work. The brother responded by stating, "He favored the women" and "Depends on how much cocaine he was on." These allusions to favoring women and drug use do not constitute prior "other acts" evidence. *See State v. Taylor*, 10th Dist. Franklin No. 12AP-870, 2013-Ohio-3699, ¶ 22 (a witness's "allusion to 'shootings' does not constitute 'other acts' evidence").

**{¶75}** Heineman's objection to testimony that he had "sexual intercourse with [N.M.] when she was too inebriated to understand what was occurring" does not accurately reflect what was testified to at trial. One of E.M. and N.M.'s brothers testified that he observed Heineman having sex "with other women" when N.M. was in the room but too drunk to realize what was happening. Nonetheless, we do not find that this "other act" was improperly admitted to show that Heineman abused E.M. when she was a child. There was no testimony that these "other women" were minors, and Heineman was not convicted of having an extramarital affair.

**{¶76}** The final piece of evidence that Heineman finds objectionable under Evid.R. 404(B) is E.M.'s sister-in-law's testimony that "Heineman commented that [N.M.] needed to 'tone up' her body more like [E.M.]" In overruling Heineman's objection to this testimony, the court found that Heineman's comment did not amount to a "prior bad act" under Evid.R. 404(B). In *State v. Patton*, 74 Ohio App.3d 224, 598 N.E.2d 777 (3d Dist.1991), the Third District Court of Appeals found that the defendant's "salacious comments and remarks" did not amount to "other acts." "The term 'act' is defined, inter alia, as '[t]he process of doing something; action: * * * Something that is done or performed; deed * * *.'" *Id.* at 229. In following *Patton*, we find no abuse of the trial court's discretion in the admission of evidence under Evid.R. 404(B). Heineman's seventh assigned error is overruled.

## Sentencing

**{¶77}** In Heineman's eighth assigned error, he argues that his prison sentence is contrary to law because the court punished him for going to trial and failed to analyze the proper felony sentencing statutory factors.

**{¶78}** R.C. 2953.08(G)(2) provides, in part, that when reviewing felony sentences, the appellate court's standard of review is not whether the sentencing court abused its discretion; rather, if this court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under R.C. 2929.14(C)(4)," or that (2) "the sentence is otherwise contrary to law," then we may conclude that the court erred in sentencing.

**{¶79}** A sentence is not clearly and convincingly contrary to law "where the trial court considers the purposes and principles of sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors listed in R.C. 2929.12, properly applies post-release control, and sentences a defendant within the permissible statutory range." *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 10.

**{¶80}** One of the factors a court may consider in sentencing an offender for a felony is whether the defendant shows remorse for the offense. R.C. 2929.12(D)(5). However, "the appearance that a defendant is being punished for going to trial creates a chilling effect, and a record that allows such an inference requires remand for resentencing." *State v. Taogaga*, 8th Dist. Cuyahoga No. 83505, 2004-Ohio-5594, ¶ 18.

**{¶81}** In the instant case, postrelease control and the permissible statutory range of Heineman's sentence is not being challenged. The court sentenced Heineman to five years in prison for each of the six rape counts, plus five years in prison for all other counts, to run consecutively, for an aggregate prison term of 35 years.

**{¶82}** The court stated the following at Heineman's sentencing hearing: "just prior to this litigation, there was a potential plea bargain that was placed upon the record, and the defendant had an opportunity to accept responsibility for his behavior and to demonstrate some remorse. You have not chosen to do so at any stage throughout this proceeding." The court further stated that "sexual offenders are the least likely to accept responsibility for their behavior even in the face of overwhelming evidence, including such as audio tapes in this case." The court took into consideration the age of the victim,

the impact that Heineman's actions had on E.M. and her family, and the community's responsibility to protect its children.

{¶83} The court also noted that it took the following into consideration in imposing consecutive sentences on the rape counts:

> * * * to protect the public from this offender. This sentence is not disproportionate to the conduct and the danger that he poses. Obviously the victim in this case began victimization at six years old. I make a particular finding that the harm here to the victim, to the community, to her family is so great, so unusual that no single terms reflects the seriousness of this offender's conduct, and those are the reasons set forth for that 35-year sentence.

{¶84} Upon review, we find that the record supports the sentencing court's findings, and the court considered the proper statutory factors. We additionally find that the court's reference regarding the plea bargain went toward Heineman's failure to show remorse in light of the evidence against him and was not punishment for going to trial. Accordingly, his eighth assigned error is overruled.

## Cumulative Errors

{¶85} In his ninth and final assigned error, Heineman argues that the cumulative effect of the erroneously admitted evidence prejudiced him, because the remaining evidence did not support his convictions. "A conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." *State v. Jackson*,

92 Ohio St.3d 436, 451, 751 N.E.2d 946 (2001). "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 8th Dist. Cuyahoga No. 102395, 2016-Ohio-102, ¶ 53. We found no error in Heineman's trial, and, as a result, his ninth and final assigned error is overruled.

**{¶86}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, JUDGE

EILEEN T. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR

**APPENDIX**

Assignments of Error

I.    The trial court violated Heineman's constitutional rights by permitting expert testimony from Dr. Darlene Dempster without proper qualification and/or notice.

II.   The state violated Rule 16 of the Ohio Rules of Criminal Procedure.

III.  The prosecutor made several improper comments during the state's closing argument thereby depriving Heineman of his constitutional right to due process and fair trial.

IV.   The trial court erred by providing the jury with a "flight" instruction.

V.    The trial court erred by ruling that [N.M.] was a "hostile" or "adverse witness" during the state's case-in-chief.

VI.   The trial court erred by admitting the audio recordings in the case at bar.

VII.  The trial court erred by permitting the state to introduce character and/or "other acts" evidence during its case-in-chief, thereby depriving Heineman of his right to a fair trial in violation of the United States and Ohio Constitutions.

VIII. The trial court erred and imposed a sentence contrary to law by punishing Heineman for exercising his right to trial and by failing to consider all statutory sentencing factors.

IX.   The effect of the errors in this case, both independently and cumulatively, deprived Heineman of a fair trial to a sufficient degree so as to warrant a reversal of his convictions and a remanding of the case for a new trial.